UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JENNIFER CHAMPAGNE,          :
        Plaintiff       :   Case No. 3:18-cv-01390 (VLB)
                       :
v.                       :
                       :
COLUMBIA DENTAL, P.C.,      :
        Defendant   :   August 9, 2019

## LOCAL RULE 56(a)(1)
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The plaintiff filed her Commission on Human Rights and Opportunities (CHRO) affidavit of illegal discriminatory practice on January 2, 2018. Attached hereto in support thereof is the plaintiff's sworn affidavit of illegal discriminatory practices.

2. Dr. J. Robert Stanko, an employee of the defendant, massaged the plaintiff's shoulders on two occasions, each lasting between ten and fifteen seconds, in November, 2016. Attached hereto in support thereof are pages 103-109 of the plaintiff's deposition transcript.

3. The plaintiff worked at the defendant's Rocky Hill branch office from August, 2016 to March 27, 2017. Attached hereto in support thereof is page 146, lines 8-11, of the plaintiff's deposition transcript.

4. The plaintiff never complained to the defendant concerning the two shoulder massages. Attached hereto in support thereof is page 109, lines 15-23, of the plaintiff's deposition transcript.

5. Dr. Stanko threw burs, at least one of which bounced and struck the plaintiff or a patient. Attached hereto in support thereof are pages 60-64 of the plaintiff's deposition transcript.

6. Dr. Stanko threw a probe to the floor once in March, 2017. Attached hereto in support thereof is page 66, lines 1-6, of the plaintiff's deposition transcript.

7. Dr. Stanko on three occasions threw a pen toward the floor, but never toward the plaintiff. Attached hereto in support thereof is page 67, lines 8-21, of the plaintiff's deposition transcript.

8. Dr. Stanko on three or four occasions threw suction tips to the floor, but never toward the plaintiff. Attached hereto in support thereof is page 69, lines 4-19, of the plaintiff's deposition transcript.

9. Dr. Stanko punched the battery pack on his own belt fifteen times. Attached hereto in support thereof are page 71, line 17, to page 72, line 14, of the plaintiff's deposition transcript.

10. Dr. Stanko "yelled" "lots of times." Attached hereto in support thereof is page 75, lines 3-21, of the plaintiff's deposition transcript.

11. Dr. Stanko swore multiple times. Attached hereto in support thereof are page 79, line 21, to page 80, line 23, of the plaintiff's deposition transcript.

12. Dr. Stanko referred to the plaintiff as a "hot assistant" and "daytime wife" several times. Attached hereto in support thereof are page 85, line 16, to page 88, line 23, of the plaintiff's deposition transcript.

13. Dr. Stanko guided the plaintiff's hand in suctioning a patient during a dental procedure on February 21, 2017. Attached hereto in support thereof are page 125, line 15, to page 127, line 5, of the plaintiff's deposition transcript.

14. Dr. Stanko transferred an instrument to the plaintiff's hand during a dental procedure on March 27, 2017. Attached hereto in support thereof are page 129, line 16, to page 130, line 20, of the plaintiff's deposition transcript.

15. The plaintiff never resigned from her position with the defendant. Attached hereto in support thereof are page 146, line 8, to page 147, line 6, of the plaintiff's deposition transcript.

16. The plaintiff was not constructively discharged from the defendant. Attached hereto in support thereof are page 150, line 22, to page 151, line 8, of the plaintiff's deposition transcript.

17. The defendant did not discharge the plaintiff, but suspended her because she failed the radiology portion of the DANB examination. Attached hereto in support thereof are page 56, line 19, to page 57, line 13, of the Jola Ochrim deposition transcript.

By___ /s/ Thomas A. Amato_____
    Thomas A. Amato
    357 East Center Street
    Manchester, CT 06040
    Telephone: 860-643-0318
    Facsimile: 860-643-2725
    Email: AmatoLaw@att.net
    Federal bar number ct14221
    Its Attorney

This is to certify that a copy of the foregoing Statement was mailed electronically to all counsel and pro se parties of record, particularly James V. Sabatini, 1 Market Square, Newington, CT 06111, email: jsabatini@sabatinilaw.com on August 9, 2019.

    _____/s/ Thomas A. Amato_____
    Thomas A. Amato

## State of Connecticut
## Commission on Human Rights and Opportunities

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

| For CHRO Office Use Only |
|---|
| Date Filed: 1-2-18          Case No: 1810295 |

My name is Jennifer Champagne
And I reside at 3 Granbrook Park Road, Granby, CT 06026
My mailing address is (if different than street address) _____
My telephone number is (home) _____ (cell) 860-709-5208
My email address is jenchampagne@vmail.com
The respondent is Columbia Dental, P.C.
Whose business address is 483 West Middle Turnpike, Unit 214, Manchester, CT 06040
The alleged discrimination took place in the town/city of Rocky Hill
The last discriminatory action took place on or about on or about April 10, 2017

I was
☐ denied reasonable accommodation on the basis of a disability on or about _____
☑ terminated on or about April 10, 2017     ☑ suspended on or about April 10, 2017
☐ laid off on or about _____     ☐ not recalled on or about _____
☐ demoted on or about _____     ☐ harassed on or about _____
☐ poorly evaluated on or about _____     ☐ warned on or about _____
☐ sexually harassed on or about _____     ☐ denied a raise on or about _____
☐ earning unequal pay on or about _____     ☐ transferred on or about _____
☐ delegated unequal duties on or about _____     ☐ constructively discharged on or about_____
☐ delegated difficult assignments on or about ___     ☐ not hired on or about _____
☐ placed on probation on or about _____     ☐ not promoted on or about _____
☐ given reduced duties on or about _____     ☐ less trained on or about _____
☐ denied equal services on or about _____     ☑ retaliated against on or about April 10, 2017
☐ discriminated against in terms and conditions of employment on or about _____
☐ other _____ on or about _____

And believe that my
☐ age _____ date of birth: ____ - ____ - ____     ☐ marital status (IDENTIFY): _____
☐ physical disability (IDENTIFY): _____     ☐ race (IDENTIFY): _____
☐ learning disability (IDENTIFY): _____     ☐ color (IDENTIFY): _____
☐ mental disorder (IDENTIFY): _____     ☐ national origin (IDENTIFY): _____
☐ sexual orientation (IDENTIFY): _____     ☐ ancestry (IDENTIFY): _____
☐ gender identity or expression _____     ☐ alienage (IDENTIFY): _____
☑ sex:  ☐ male  ☑ female     ☐ intellectual disability: _____
☐ religious creed/creed (IDENTIFY): _____     ☐ sex: PREGNANCY
☑ previously opposed, filed or assisted     ☐ prior criminal record (state employment only)
☐ other _____

**Was/were in part a reason in this action.**

F103

**THIS SECTION TO BE FILLED OUT BY CHRO STAFF**
**Respondent violated the following statutes and acts listed below, as amended,**
**enforced through <u>Conn. Gen. Stat.</u> §46a-58(a) if applicable.**

[✓] 46a-60(a)(1)  [✓] 46a-60(a)(4)  [ ] 46a-60(a)(5)  [ ] 6a-60(a)(7)_____
[ ] 46a-60(a)(8)( )( )  [ ] 46a-60(a)(9)  [ ] 46a-60(a)(10)  [ ] 46a-60(a)(11)
[ ] 46a-63  [ ] 46a-64(a)( )  [ ] 46a-66(a)  [ ] 46a-70a  [ ] 46a-71_____
[ ] 46a-75  [ ] 46a-80_____  [ ] 46a-81c_____  [ ] 46a-81d(a)_____

[ ] 46a-81f_____  [ ] 46a-81g  [ ] 46a-81h_____  [ ] 46a-81l_____  [ ] 10-15(c)
[✓] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C 2000e and the Civil Rights
Act of 1991 (15 + employees)  [ ] Age Discrimination in Employment Act of 1967, 29
U.S.C. 621-634 (20+ employees and over the age of 40)  [ ] Equal Pay Act of 1964
[ ] Americans With Disabilities Act, 42 U.S.C. 12101 et seq.
[ ] Rehabilitation Act of 1973, as amended
[ ] Other:_____

F103

## COMPLAINANT'S AFFIDAVIT

1.  Complainant is Jennifer Champagne. Complainant resides at 3 Granbook Park Road, Granby, Connecticut 06026.

2.  Respondent is Columbia Dental, P.C. Respondent's business address is 483 West Middle Turnpike, Unit 214, Manchester, Connecticut 06040.

3.  Respondent operates a facility at 2049 Silas Deane Highway, Rocky Hill, Connecticut 06067.

4.  Respondent employed complainant.

5.  Respondent employed complainant at its Rocky Hill location.

6.  Respondent hired complainant in August, 2016.

7.  Respondent hired complainant as a Dental Assistant.

8.  Complainant is female.

9.  Respondent employs Dr. John Stanko, DMD.

10. Stanko is male.

11. Stanko is a supervisory employee.

12. Stanko supervised complainant.

13. Stanko throws and punches items in the office, yells, and curses.

14. Stanko has addressed complainant as his "hot assistant" and his "daytime wife".

15. Stanko has massaged complainant's shoulders several times.

16. On or about February 21, 2017, Stanko grabbed complainant's hand, and used her hand to force a tube into a patient's mouth.

17. Complainant notified Lead Assistant Tarah Johnson of the incident.

18. Johnson told complainant to "write it down" and "keep track of it."

19. Jola also told complainant "if you don't work with Stanko, you won't have a job."

20. On or about March 27, 2017, Stanko took a drill, jammed it into complainant's hand, punctured her glove, and angrily told her to hold it while working on a patient.

21. Complainant texted Johnson and reported the incident.

22. Complainant also informed Johnson that she wouldn't return to work with Stanko that day because her "anxiety was through the roof."

23. On April 10, 2017, complainant received a letter from District Manager Jola Ochrim suspending her.

24. Respondent's reason for suspending complainant was that she didn't have a certification in radiation health and safety.

25. Respondent hired her knowing she did not have that certification.

26. Johnson had forwarded complainant's complaints to Ochrim.

27. Complainant discussed Stanko's conduct several times by phone after the February incident.

28. Ochrim did not rectify the problem with Stanko.

29. Ochrim did not address Stanko's behavior in any way.

30. Complainant told Ochrim that she couldn't go back to work with Stanko.

31. Ochrim responded "ok, but it's a job," and "you do have kids."

32. Respondent failed to return complainant from suspension.

33. Respondent constructively discharged complainant.

34. Complainant charges Respondent with gender discrimination, hostile work environment, and retaliation.

15. I therefore charge the Respondent(s) with discriminating against me based on my protected class base(s) and I request all damages that I might be entitled to under the relevant statutes.

**IMPORTANT: YOU MUST OBTAIN A NOTARIZATION OF YOUR COMPLAINT BEFORE YOU RETURN THIS FORM**

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Jennifer Champagne
_____ being duly sworn, on oath, states that s/he is the Complainant herein; that s/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated at ___Newington___, Connecticut this _26_ day of ___December___ 20 _17_.

x _Jen Champagne_
**(Complainant's Signature)**

Subscribed and sworn to before me this _26_ day of _Dec._ 20 _17_

_____
Notary Public or Commissioner of
the Superior Court

My Commission Expires: _____

1           UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
2

3    JENNIFER CHAMPAGNE, :

4           Plaintiff   : Case No. 3:18-cv-01390

5                        :
     V.
6                        :

7    COLUMBIA DENTAL, PC :

8           Defendant   :

9    ---------------------------------------------

10   Date:   June 17, 2019

11   Time:   12:30 P.M.

12   Town:   1 Market Square
                Newington, Connecticut
13

14

15          EXAMINATION UNDER OATH of JENNIFER

16   CHAMPAGNE, the Plaintiff herein, taken by the

17   Defendant, pursuant to Federal Rule of Civil

18   Procedure 30(b), of the Connecticut Practice

19   Book, and Notice, held at the above-mentioned

20   time and place, before Maria DiScioscia, CSR

21   and Notary Public of the State of Connecticut.

22

23

24

25

 1    massaged plaintiff's shoulders several times?

 2        A.   Yes.

 3        Q.   How many times did he allegedly do

 4    this?

 5        A.   I want to say probably around three.

 6        Q.   When was the first time?

 7        A.   Around November I hurt my neck.  I

 8    want to say it was November.

 9        Q.   2016?

10        A.   Uh-huh.

11        Q.   Tell me about what happened?

12        A.   Well, my neck was bothering me, so I

13    was going like this and I was over the

14    computer, and then he came up behind me and

15    he just started massaging my shoulders.  And

16    that was just very uncomfortable.  You know,

17    a doctor is massaging my shoulders.  I just

18    walked away and that was that.

19        Q.   What room did he do this?

20        A.   In our operatory.  We only worked

21    there.  It was the one on the right.  Three,

22    operatory three.

23        Q.   Did you say anything to Dr. Stanko

24    before he came in and did this?

25        A.   I told him my neck was really

1    bothering me today.  It was very sore today.

2    And I was over the computer, writing on the

3    computer and going like that with my neck.

4        Q.  Did he say anything to you in

5    response to that?

6        A.  Not that I recall, he just massaged

7    my shoulders.

8        Q.  Just the shoulders?

9        A.  He came up and massaged, like, my

10   arms right here and my shoulders.

11       Q.  When you say the arm's --

12       A.  Like right here.

13       Q.  -- upper arms?

14       A.  Yeah, upper arms to the shoulders.

15       Q.  For how long did he do this?

16       A.  Probably ten seconds.

17       Q.  Was there anybody else present --

18       A.  No.

19       Q.  -- when he did this?

20       A.  No, our patient had just left.

21   Because I remember I was typing all the

22   information on the computer, so she had just

23   left.

24       Q.  What about the second time, you said

25   there were three times.  The first time was

1    November of 2016?

2         A.   Yep.

3         Q.   When was the second time?

4         A.   It was right around the same time

5    because my neck was bothering me for like two

6    weeks.  I want to say within two weeks of

7    that.

8         Q.   Would that have still been November

9    of 2016?

10        A.   Yes.  I have all the dates.  I have

11   it all written down.  Did you not get all the

12   information I sent you.

13        Q.   We have the responses to the

14   interrogatories and the documents that you

15   produced, that's it.

16             You said November 2016 was the

17   second time?

18        A.   Yes.

19        Q.   Where did that occur?

20        A.   Always in our operatory, our room we

21   worked in.  This one was, I want to say I was

22   mixing solutions up and then I was

23   complaining about my neck again, and he came

24   up and did it again.  I don't know exact

25   dates.

```
 1        Q.   You complained first about your neck
 2   pain?
 3        A.   Yes.
 4        Q.   And then in response to that, he
 5   heard you and he approached you and began
 6   massaging --
 7        A.   Approached me from behind,
 8   absolutely.
 9        Q.   -- and what exactly did he massage
10   the second time?
11        A.   Same places.  Right here.  My
12   shoulders, up to my like, right here, my arms
13   and up to here, just massaged me.
14        Q.   To the neck?
15        A.   Didn't touch my neck, no.
16        Q.   Just the upper arms?
17        A.   Upper arms.
18        Q.   And the shoulders?
19        A.   Correct.
20        Q.   Was this is the operatory room?
21        A.   Yes.
22        Q.   Was there anybody else present when
23   this --
24        A.   No.
25        Q.   -- occurred?
```

1    A.  Nope.

2    Q.  How long did Dr. Stanko take to

3    perform this?

4    A.  Not long, like 15 seconds, ten to 15

5    seconds, it wasn't long.  Under a minute.

6    Q.  After he did that the first time in

7    November of 2016, did you tell Dr. Stanko

8    that you didn't like that and didn't want him

9    to do that again?

10   A.  I don't recall.  I know I just

11   walked away because I was uncomfortable.  I

12   just left the room, I know that.  I don't

13   recall if I said anything, but I was like in

14   shock.  I just felt very uncomfortable, so I

15   kind of, like, froze and then I just walked

16   out of the room, that first time.  The second

17   time I don't recall if I said something.  No.

18   I don't recall.

19   Q.  You don't recall saying anything on

20   either occasion?

21   A.  I know I walked out of the room

22   because I felt very uncomfortable.

23   Q.  On the third occasion, when was

24   that?

25   A.  I don't remember that exact -- I

```
 1    don't know if it was two or three times, but
 2    I don't remember.  I remember those two that
 3    I just told you about.
 4       Q.  You don't recall any other
 5    incidents?
 6       A.  No.  Just those two I remembered
 7    around the time.
 8       Q.  Did Dr. Stanko ever tell you that he
 9    was trained in a particular medical modality
10    for treating people with that kind of tension
11    and giving massages?
12            MR. SABATINI:  Objection to
13        form.
14            THE WITNESS:  No.
15    BY MR. AMATO:
16       Q.  He never told you anything like
17    that?
18            MR. SABATINI:  Objection to
19        form.
20            MR. AMATO: She can answer it.
21            MR. SABATINI: I'm just
22        objecting to the form.
23            Hear me instructing her not to
24        answer?
25            MR. AMATO:  Okay counsel, I
```

Paragraph 4

```
 1         understand.
 2              THE WITNESS:  Not that I
 3         recall.
 4              MR. SABATINI:  The reason why I
 5         say that is, because I don't
 6         understand your response.
 7              MR. AMATO:  My response to
 8         what?
 9              MR. SABATINI:  To me objecting
10         to the form.
11              MR. AMATO:  You can object to
12         the form, that's fine.
13              MR. SABATINI:  Right.
14    BY MR. AMATO:
15         Q.  Now, at no time after the second
16    occasion did you ever submit any written
17    complaint to anybody at the second occasion?
18         A.  Not that I recall.
19         Q.  How about the first time.  Do you
20    recall ever submitting any kind of written
21    complaint to any staff member at the company
22    regarding the first incident of massage?
23         A.  I don't remember.
24         Q.  At the time in November 2016, were
25    you being treated for neck pain?
```

```
1        Q.   When was the next date you were
2    scheduled to?
3        A.   I wasn't scheduled, rescheduled.
4        Q.   Nobody had scheduled you for work?
5        A.   Nope.
6        Q.   Why was that?
7        A.   You would have to ask them.
8        Q.   Did you ever return to work at all
9    after March 27, 2017 to Columbia Dental?
10       A.   No, because I wasn't on the
11   schedule.
12       Q.   Because, what?
13       A.   I was not on the schedule.
14       Q.   So the answer is, no?
15       A.   No.
16       Q.   You never went back?
17       A.   No.
18       Q.   Did you ever submit a letter of
19   resignation to the defendant?
20       A.   No.
21       Q.   Did you ever inform anybody at the
22   defendant, that you were not going to return
23   to work?
24       A.   No.
25       Q.   Did you ever inform anybody that you
```

```
 1      Q.   How many times?
 2      A.   A lot.  I don't know the exact
 3   amount, but a lot.  More than five.
 4      Q.   More than five.  More than 10?
 5      A.   More than ten, yes.
 6      Q.   More than 15?
 7      A.   Around there.
 8      Q.   So around 15 times; is that right?
 9      A.   Yes.
10      Q.   This is between August of 2016 and
11   the time that you left; is that right?
12      A.   Correct, yes.
13      Q.   Do you remember the dates that he
14   threw these items?
15      A.   I don't know the precise dates.  I
16   knew -- I have them written down.
17      Q.   Where?
18      A.   On my phone, through emails through
19   my head assistants, i wrote in letters.  I've
20   given them to Ray.  We talked to Ray about
21   it.  They have it all on record.  We wrote
22   all this down, the exact dates of certain
23   things.  I know March 27th was -- he stabbed
24   me with the drill with a Bur at the end.
25      Q.   I'm taking right now, I'm kind of
```

```
 1    focusing on your allegations he threw certain
 2    items.
 3        A.  Yes.
 4        Q.  So I want to focus on that.  When
 5    was the last time that you said you saw him
 6    throw --
 7        A.  March 27th.
 8        Q.  What did he throw on March --
 9        A.  A Bur.
10        Q.  -- March 27th?
11        A.  A Bur.
12        Q.  A Bur at whom?
13        A.  At me.
14        Q.  Were there any other times prior to
15    March 27th that he threw anything?
16        A.  Yes.  Between January and March,
17    lots of times he would throw things.  I don't
18    know the exact dates and times.  Like I just
19    said, it's been over three years, but I did
20    document things.  I do have that in record.
21    I did write complaints on the days he did
22    that stuff to the company.  And I reported
23    all that and I have witnesses and a patient
24    who witnessed it and I have her name.  And
25    she told me if she ever needs me, she's seen
```

```
1    what he's done to me, how he squeezed my hand

2    and stabbed me with the Bur, so she's a

3    witness for that. So I have all that

4    documented.

5        Q.   Between January 2017 and March 2017

6    that's when you observed Dr. Stanko throw --

7        A.   A lot.

8        Q.   -- items.

9        A.   Before that also.  Those last couple

10   of months it was more than usual.

11       Q.   Tell me what it was that you saw him

12   throw on these multiple times?

13       A.   He would get mad if a Bur was not

14   working correctly, so he would snap it and

15   throw it. He would get mad at instruments --

16       Q.   Stop, stop.  Stop there for a

17   moment.

18            MR. SABATINI:  You can't cut

19        her off at her answer. You have to

20        allow her to finish her answer.

21            MR. AMATO:  Well, I want to

22        focus on one thing.

23            MR. SABATINI:  That's fine.

24        But if she is mid-way through an

25        answer, she has to finish the answer
```

1         then.

2    BY MR. AMATO:

3         Q.   All right. Finish the answer then.

4         A.   He would get mad if instruments were

5    not sharpened properly and try to brake them

6    and throw them.  I've seen him take suctions

7    and through them, pens.  Just very angry,

8    mad.

9         Q.   You mentioned instruments and pens?

10        A.   Pens.

11        Q.   What was the other category?

12        A.   Burs, a lot of Burs.

13        Q.   Let's start with the Burs for a

14   moment.  How many times did you observe him

15   throwing Burs?

16        A.   Several.

17        Q.   All after January of 2017?

18        A.   No, not all.  Between my whole seven

19   months or six months.  From the day I started

20   to the day I ended, is when I saw him do

21   these things.

22        Q.   Where or to whom, did he throw these

23   Burs?

24        A.   Sometimes at me and sometimes just

25   to the ground and then they would ricochet

```
 1    and hit me or our patient.
 2        Q.  Did you ever see him throw any Burs
 3    in the presence of patients?
 4        A.  Yes.
 5        Q.  How many times?
 6        A.  Multiple.
 7        Q.  What room did he throw these Burs?
 8        A.  It was always in one or two rooms
 9    usually.  There was -- I don't know the name
10    of them, it was our room.
11        Q.  Were you the only one who was
12    present in these rooms when he threw the
13    Burs?
14        A.  No, our patients were also.
15        Q.  Were there any other staff members
16    that worked for the defendant at the time
17    that you saw Dr. Stanko throw these Burs?
18        A.  No, not that I recall.
19        Q.  When he threw these Burs, it was
20    only you and the patients in the room?
21        A.  There might have been a few times
22    that a couple people witnessed it.  I'm not
23    going -- I don't know for sure if it was
24    throwing of the Burs, but they've seen him
25    throw things.  I'm not sure if it was the
```

```
1        Q.   A probe.  You saw him throw a probe?
2        A.   Yes, because it was bent.
3        Q.   How many times did you see Dr.
4    Stanko throw a probe?
5        A.   Once.  One time I've seen him throw
6    the probe.
7        Q.   When was that?
8        A.   It was like around March, right
9    before I left.  The last three months between
10   January and March and I have it all written
11   down.  I have it documented.
12       Q.   One time between January and March
13   of 2017 you saw him throw this probe?
14       A.   Yep.
15       Q.   In what room did he throw it?
16       A.   The room that we worked in.
17       Q.   Where did he throw the probe to?
18       A.   On the floor.
19       Q.   Who was present in the room at the
20   time that you saw him throw this probe?
21       A.   Me, him and the patient.
22       Q.   No other staff members were there?
23       A.   No.
24       Q.   How about Cynthia Holmes, did she
25   witness Dr. Stanko throw anything in your
```

```
 1    presence?

 2         A.   On that day?

 3         Q.   Yes.

 4         A.   Not that I recall.

 5         Q.   You mentioned instruments and the

 6    Burs?

 7         A.   Yes.

 8         Q.   You mentioned that you also saw Dr.

 9    Stanko throw pens; is that right?

10         A.   Yes, he threw everything.

11         Q.   How many times did you see him throw

12    pens?

13         A.   Several.

14         Q.   And many times is several?

15         A.   Three.

16         Q.   When?

17         A.   Between my day of employment until

18    my ending date of employment.  I don't know

19    the specific dates of that.  I did not write

20    that down, but between those -- when I worked

21    there.

22         Q.   Where, in what room?

23         A.   Always in our room that we worked

24    in.

25         Q.   Always one room?
```

Paragraph 8

```
1    and I think you said the Burs on several
2    occasions; is that correct?
3         A.   Absolutely.
4         Q.   Were there any other items that you
5    claim to have seen Dr. Stanko throw at any
6    time during your tenure at the company?
7         A.   I've seen him do suctions too,
8    suction tips, he'd throw them on the ground
9    mad.
10        Q.   How many times did you observe Dr.
11   Stanko throw suction tips?
12        A.   Several, three.
13        Q.   Three or four?
14        A.   Three or four.  I don't know the
15   exact number, so several is my guess.
16        Q.   When did you see him throw the
17   suction tips?
18        A.   From when I started until when I
19   ended employment on various occasions.
20        Q.   Where?
21        A.   In our room always.
22        Q.   Where did he throw the suction tips?
23        A.   On the ground.
24        Q.   To the floor?
25        A.   To the floor.
```

```
1        Q.   How about the Burs?

2        A.   Yes.

3        Q.   Did Dr. Stanko ever tell you that he

4   was trying to throw theses items, whether it

5   be the pens or the probes or the suction tips

6   or the Burs, into a container?

7        A.   No.

8        Q.   Were there any other items, other

9   than the ones to which you just testified,

10  that you claim to have seen Dr. Stanko throw?

11       A.   Just instruments like I said in the

12  beginning.  Nope.

13       Q.   Other then what you've just

14  testified to, there's nothing else that you

15  can recall?

16       A.   That he's thrown, not that I recall.

17       Q.   You also mentioned or allege in the

18  same paragraph that you saw Dr. Stanko punch

19  items in the office?

20       A.   Yes.

21       Q.   Lets start with, what exactly is it

22  or was it that you saw him punch?

23       A.   There's a battery that connects to

24  his glasses, which controls his light.  So

25  when his light would go out, he would get
```

```
 1    very angry and punch the battery, because it
 2    was -- the way you moved it, sometimes the
 3    light would go on.  So he would meanly punch
 4    his battery with our patient's there in front
 5    of me, punch at his battery until it turned
 6    on.
 7         Q.  On how many occasions did you
 8    observe Dr. Stanko punching this battery?
 9         A.  A lot.  At least 15 times throughout
10    the months of my employment there.
11         Q.  When was the last time that you saw
12    him punch this battery packed?
13         A.  End of March, right when I stopped
14    working there.
15         Q.  When was the last time you saw Dr.
16    Stanko throw a pen?
17         A.  Around, in March.
18         Q.  How about the last time you saw him
19    throw a Bur?
20         A.  March.
21         Q.  When in March?
22         A.  March, don't know the exact dates.
23         Q.  How about the time you saw him throw
24    the probe.  When was the last time you saw
25    him throw a probe?
```

```
 1    time that he punched the battery?
 2        A.   I don't recall.
 3        Q.   Did you ever observe Dr. Stanko yell
 4    in your complaint, amended complaint
 5    paragraph 19?
 6        A.   Always.
 7        Q.   You say here, Dr. Stanko yells,
 8    quote/unquote.
 9             Tell me what you mean by "yell"?
10        A.   He would just get angry. He would
11    call us all incompetent.  You guys do nothing
12    right.  Yeah, just very mean stuff.
13        Q.   When he accused you guys, you
14    said --
15        A.   Yes, the whole office.
16        Q.   -- of being incompetent, was he
17    addressing that comment to anybody other than
18    you?
19        A.   He would express it to me about
20    other people sometimes, but he -- yes.  Yes.
21    Yes.
22        Q.   Who else was it that was present
23    that heard Dr. Stanko yell about people being
24    incompetent?
25        A.   Tia, which was the front desk.
```

Paragraph **11**

```
1      A.  Who did he call?
2      Q.  Yes.
3      A.  Probably -- I'm not sure.  I don't
4   recall exactly who it was made too, just to
5   everybody.  To me, the other assistants, to
6   Dr. Pandey on his work that he used to do.
7      Q.  Did he ever address Dr. Pandey and
8   accuse him of being stupid and incompetent?
9      A.  To his face?
10     Q.  Yes.
11     A.  Not that I recall.
12     Q.  He would say it to you?
13     A.  Yes.
14     Q.  In other words, he would complain
15  about Dr. Pandey to you?
16     A.  Yes, about his work on patients.
17     Q.  Did you ever observe Dr. Stanko
18  consult or accuse Dr. Pandey to other people,
19  other staff members besides you?
20     A.  Not that I recall.
21     Q.  You also mentioned in your complaint
22  that Dr. Stanko cursed or curses,
23  quote/unquote.
24     A.  Yes.
25     Q.  What do you mean by that?
```

```
1        A.   Jesus Christ. I don't like that word
2   in vein.  He's swore in other ways.  But that
3   was one that I complained about and I wrote
4   down in the write-up.  He said, Jesus Christ,
5   people are incompetent.  Dr. Pandey messed
6   this patients mouth up.  So that's one of
7   them.
8        Q.   How many times did he use this
9   phrase?
10       A.   Jesus Christ?
11       Q.   Let me go back and withdrawn that.
12       A.   Yeah.
13       Q.   Did you ever hear him use any other
14  phrases that you would categories as cursing,
15  other than Jesus Christ?
16       A.   He swore, yeah.
17       Q.   Like what else did he say?
18       A.   Like, shit. You know, like, asshole.
19  Like swears.
20       Q.   That's it?
21       A.   Yes.  That I can recall.
22       Q.   How many times times did you hear
23  Dr. Stanko say these phrases?
24       A.   Multiple times.
25       Q.   Over what period?
```

```
 1    and to -- with everything else he's done to
 2    me, like, massage my shoulders, call me his
 3    hot assistants, call me his daytime wife,
 4    that all goes hand-and-hand with everything.
 5    It's because I'm a women.  And I felt like
 6    that was -- I mean, you're not supposed to
 7    grab someone's hand and squeeze it and do all
 8    the things he's done to me, that's not okay.
 9    I'm an dental assistant, I'm not his daytime
10    wife.
11        Q.  You think that these incidents of
12    cursing and throwing things and punching
13    things, related to these other actions
14    somehow to make them sexual?
15        A.  Yes.
16        Q.  Photograph 20 of your amended
17    complaint says Dr. Stanko would address you
18    at his quote, hot assistants, unquote and his
19    quote, daytime wife, unquote.
20        A.  Uh-huh.
21        Q.  How many times did he address you as
22    his quote, hot assistant, unquote?
23        A.  Several times, from when I started
24    until when I ended.
25        Q.  When was the last time?
```

```
 1      A.  I'm not quite sure.  I'm not sure
 2  the exact dates.
 3      Q.  Where did he make these comments to
 4  you?
 5      A.  In our operatory room.
 6      Q.  Were there ever anybody, other staff
 7  members, present in the operatory room when
 8  he made those comments?
 9      A.  No, only our patients.
10      Q.  How about Crystal Holmes, did she
11  ever witness any of this?
12      A.  Not sure.
13      Q.  How about Tia?
14      A.  I don't remember.
15      Q.  How about Jola?
16      A.  I don't recall.
17      Q.  And how about Alex?
18      A.  I don't recall.
19      Q.  In what context if, any, did he
20  address you as his "hot assistants"?
21      A.  What do you mean, "what context"?
22      Q.  He just didn't come out and say, hot
23  assistant, did he?
24      A.  No.
25      Q.  He must have said that in context or
```

```
1    something else.
2         A.   So a few of his friends that were
3    patients would come in and we'd work on them
4    and he'd be like, here's my hot assistant,
5    Jennifer.  That's how he would do it.  If he
6    knew the gentlemen that we were working on,
7    then he would say it.
8         Q.   Did you ever hear him address anyone
9    else, any other staff members in the same
10   way?
11        A.   No.
12        Q.   How many times did Dr. Stanko
13   address you as his quote, daytime wife,
14   unquote?
15        A.   Several.
16        Q.   When was the last time?
17        A.   I don't know the exact date, the
18   last several months of me working.
19        Q.   What does that mean?
20        A.   Last three -- within the last four
21   months of my employment.
22        Q.   But not before that?
23        A.   Maybe before.  I don't recall the
24   exact dates.  It's been over three years, so
25   my memory is a little foggy with exact dates.
```

1    Q.  Is it fair to say then, Ms.

2    Champagne, you're not sure when the last time

3    was that Dr. Stanko addressed you as a hot

4    assistant?

5        A.  I want to say that it was between my

6    first date of employment and my last, several

7    times he did, that I could say.  Within

8    probably, about four times within the month I

9    worked there.

10   Q.  But not the last time?

11       A.  No, not the exact date of the last

12   time.

13   Q.  And the same is true with respect to

14   the daytime wife allegation?

15       A.  Yes, some time in March.

16   Q.  Oh, you think he called you his

17   daytime wife sometime in March?

18       A.  Sometime in March, one of them.

19   Q.  What makes you say it was in March?

20       A.  Because I remember that was my last

21   month there.  So he was very -- that's -- so

22   mean and just the things he was saying, so I

23   documented a lot of things in March.  I wrote

24   stuff down in March, and I handed that into

25   the company in March.  So a lot of this has

1    Q.   How many other dental assistants

2    were typically there when you were at the

3    Rocky Hill branch working?

4         A.   At least three at a time.

5         Q.   Including you?

6         A.   Including me.

7         Q.   You never did retake the exam prior

8    to April 10, 2017 did you?

9         A.   I took it in December. No.

10        Q.   Now, after December of 2016, you

11   never retook the exam between December of

12   2016 and April 10, 2017; is that right?

13        A.   No. I took the test once, that was

14   it.

15        Q.   In paragraph 22 of the the amended

16   complaint you state quote:  On or about

17   February 21, 2017 Dr. Stanko grabbed

18   plaintiff's hand and used her hand to force a

19   tube into a patients mouth, unquote.

20        A.   What was that date.

21        Q.   According to your complaint, it was

22   February 21, 2017.

23        A.   Okay.

24        Q.   Tell me exactly what happened that

25   day?

1    A.   Okay.  He just squeezed my hand.

2    Q.   "He" meaning Dr. Stanko?

3    A.   Yes.  Dr. Stanko and just forcefully

4  made me suction the way he wanted me.  As

5  he's squeezing my hand forcefully, this is

6  how I want it done.

7    Q.   That was in pursuant to a patients

8  treatment?

9    A.   Correct.  In the patient mouth, over

10 the patient.

11   Q.   Who else was in the room --

12   A.   Just me --

13   Q.   Please let me just finish the

14 question. Who else is there besides you, Dr.

15 Stanko and the patient?

16   A.   Just me, Dr. Stanko and the patient.

17 We didn't like a lot of other assistants in

18 the room when you're working on a patient.

19 Unless it was a surgery, it's only going to

20 be three people in there, which is the

21 assistant, the doctor and the patient.  We

22 don't liked the rooms over-packed, they're

23 not very big rooms. Usually just three.

24   Q.   So nobody else then?

25   A.   No.

1    Q.  What procedure were you and Dr.

2  Stanko performing?

3    A.  Oh gosh, I don't remember that.

4    Q.  He touched only your hand; right?

5    A.  Squeezed my hand.

6    Q.  Which hand did he touch?

7    A.  My right.

8    Q.  Just the right hand?

9    A.  Uh-huh.

10   Q.  You were both wearing gloves?

11   A.  Yes.

12   Q.  What type of tube was it that he was

13  guiding?

14   A.  It's a suction tip.

15   Q.  Did you notify anybody after this

16  incident occurred?

17   A.  Tarah.

18   Q.  Tarah?

19   A.  Through email, through text.

20        MR. SABATINI:  I've got to take

21     a break.

22        MR. AMATO:  Of course Mr.

23     Sabatini, that's fine.  2:45 p.m?

24        MR. SABATINI:  That's good.

25        (Whereupon, a short recess was

```
 1   she's reporting it.  She has records of it
 2   now and she's reporting it because that's
 3   what she's supposed to do.
 4       Q.  How did she communicate her response
 5   to you?
 6       A.  Through text.  I have it.
 7       Q.  Now, Dr. Stanko as part of this
 8   incident, never made any threats about your
 9   job position did he?
10       A.  Not that I recall.
11       Q.  He just grabbed your hand and used
12   it to force a tube into a patients mouth?
13       A.  Correct.
14       Q.  Is that right?
15       A.  Yes.
16       Q.  In paragraph 30 if your amended
17   complaint you said quote:  On or about March
18   27, 2017 Stanko took a drill, jammed it to
19   plaintiff's hand, punctured her glove and
20   angrily told her to told it while working on
21   a patient, unquote.
22            Describe exactly what else happened,
23   if anything?
24       A.  Well, he was drilling in our patient
25   Francesca's mouth and I don't know what
```

1   happened, but he got angry about something

2   and he took his drill and he jammed it into

3   my hand.  He said, hold this and he jammed it

4   into my hand and my glove ruptured and it

5   punctured my glove and it hit my skin and

6   then he took -- and I held that in my left

7   and he took both of his hands angrily and

8   squeezed my hand very hardly, to suction the

9   patients mouth.

10      Q.  You were holding the suction in your

11  left-hand?

12      A.  No, my right-hand.

13      Q.  Dr. Stanko was across the patient --

14      A.  Patient.

15      Q.  -- from you?

16      A.  Yep.

17      Q.  And you're saying he took this, was

18  it a drill?

19      A.  Yes.  It's what you drill, like,

20  cavities and stuff, like, you drill out.

21      Q.  Or a composite gun?

22      A.  It was a drill.

23      Q.  What's the difference between a

24  drill and a composite gun?

25      A.  A composite gun is what you fill the

1      Q.  When was the next date you were

2   scheduled to?

3      A.  I wasn't scheduled, rescheduled.

4      Q.  Nobody had scheduled you for work?

5      A.  Nope.

6      Q.  Why was that?

7      A.  You would have to ask them.

8      Q.  Did you ever return to work at all

9   after March 27, 2017 to Columbia Dental?

10     A.  No, because I wasn't on the

11  schedule.

12     Q.  Because, what?

13     A.  I was not on the schedule.

14     Q.  So the answer is, no?

15     A.  No.

16     Q.  You never went back?

17     A.  No.

18     Q.  Did you ever submit a letter of

19  resignation to the defendant?

20     A.  No.

21     Q.  Did you ever inform anybody at the

22  defendant, that you were not going to return

23  to work?

24     A.  No.

25     Q.  Did you ever inform anybody that you

```
 1    were resigning from the company?
 2         A.   No.
 3         Q.   Did you ever receive something from
 4    the company indicating that you were
 5    suspended?
 6         A.   Yes.
 7         Q.   When?
 8         A.   I want to say April 10th or 12th,
 9    somewhere around there.
10              MR. AMATO: Please mark that for
11         identification.
12              (WHEREUPON, Exhibit 3, Columbia
13         Dental letter dated 4/10/17, was marked
14         for identification, as of this date.)
15    BY MR. AMATO:
16         Q.   If you could please, just review
17    that form first.
18         A.   Okay.  Yep, 4/10, like I said.  Look
19    at that, I'm good.
20         Q.   Does that form appear to be the same
21    notice that you received from the company?
22         A.   Yeah, I receive it through email.
23         Q.   Ms. Ochrim emailed that same form to
24    you?
25         A.   Yes.
```

```
 1    made, were they focused on the February
 2    incident?
 3         A.  All the incidents.  I mean each
 4    complaint I made, the same thing would
 5    happen.  I would complain to people and they
 6    would complain to higher-ups and that's what
 7    happened.
 8         Q.  Because the paragraph 39 identifies
 9    specifically the February incident.
10         A.  Okay.
11         Q.  That's why I was asking?
12         A.  With the suction.  Okay.  Yep.
13         Q.  Paragraph 43 of the amended
14    complaint state's Ochrim responded quote:
15    Okay, but it's a job, unquote.  And quote,
16    you do have kids, unquote.
17             When did she tell you that?
18         A.  March 27th in the office right to my
19    face as I'm crying.
20         Q.  Face-to-face?
21         A.  Face-to-face.
22         Q.  Paragraph 45 of the amended
23    complaint states quote:  Defendant
24    constructively discharged the plaintiff,
25    unquote.
```

1         Explain what you mean by that?

2    A.   What was that?

3    Q.   You said in paragraph 45 of the

4    amended complaint that quote: Defendant

5    constructively discharged the plaintiff,

6    unquote.

7    A.   I have no idea what that is.  No

8    clue.

9    Q.   Paragraph 56 of the amended

10   complaint states quote:  Dr. Stanko's

11   workplace misconduct is described herein,

12   caused plaintiff to suffer from anxiety,

13   unquote.

14        What does that mean.  What kind of

15   anxiety are you referring to?

16   A.   The minute I would walk into the

17   office, I would have panic attacks.  Like,

18   it's hard for me the breath, my eye would

19   start twitching.  I just -- it was just hard

20   for me to be around him.  It was scary.  I

21   didn't know what he was going to do

22   minute-by-minute.

23   Q.   When did you first begin to

24   experience these episodes of anxiety?

25   A.   I want to say probably five months

```
 1            A C K N O W L E D G M E N T
 2
 3    STATE OF CONNECTICUT       )
 4                               :ss
 5    COUNTY OF                  )
 6
 7            I, JENNIFER CHAMPAGNE, hereby certify
 8    that I have read the transcript of my
 9    testimony taken under oath in my deposition of
10    JUNE 17, 2019; that the transcript is a true
11    and complete record of my testimony, and that
12    the answers on the record as given by me are
13    true and correct.
14
15
16                     _____
17                     JENNIFER CHAMPAGNE
18
19    Signed and subscribed to before me this
20    _____ day of _____, 2019.
21    _____
      Notary Public, State of Connecticut
22
      Commission expires April 30, 2022
23
24
25
```

1           C E R T I F I C A T E

2

3           I, Maria DiScioscia, a shorthand

4   reporter and Notary Public within and for the

5   State of Connecticut, do hereby certify:

6           That the witness(es) whose testimony

7   is hereinbefore set forth, was duly sworn by

8   me; and the foregoing transcript is a true

9   record of the testimony given by said

10  witness(es).

11          I further certify that I am not

12  related, either by blood or marriage, to any

13  of the parties in this action; and that I am

14  in no way interested in the outcome of this

15  matter.

16

17  Maria DiScioscia

18  _____

19  Maria DiScioscia

20  Commission expires 4/30/22

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - -X
JENNIFER CHAMPAGNE,                  :
          Plaintiff,                 :   Case No. 3:18-cv-01390 (VLB)

                    V.               :
                                     :

COLUMBIA DENTAL, P.C.                :   June 27, 2019
          Defendant.                 :
- - - - - - - - - - - - - -X

DEPOSITION OF JOLANTA "JOLA" OCHRIM

Taken before Kirsten Telhiard, LSR 391, a Notary Public
within and for the State of Connecticut, pursuant to
Federal Rules of Civil Procedure, at the office of
Sabatini & Associates, LLC, One Market Square, Newington,
Connecticut, on June 27, 2019, commencing at 2:16 p.m.

FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT   06070
860.651.0258
www.falzaranocourtreporters.com

1    assistant can do in a dental office without being DANB
2    certified?
3           A       They used to.  Not anymore.
4           Q       When did the requirements change such that now
5    they can't do what they used to do without the DANB
6    certification?
7           A       I can't tell you completely, but a few years
8    ago, everything change.
9           Q       A few years ago?
10          A       Yeah.  And they have to -- every dental
11   assistant need to be DANB certified.  It's three different
12   -- under DANB umbrella is three different certifications.
13          Q       Did you ever discover at any time between
14   August of 2016 and late March of 2017, that -- you said
15   you came in around January or February?
16          A       Yes.
17          Q       So --
18          A       Late January.
19          Q       So between the time that you first arrived at
20   the Rocky Hill branch and, say, March 27, 2017, did you
21   ever discover that the plaintiff, Ms. Champagne, was not
22   DANB certified?
23          A       I discovered that, yes.
24          Q       Did you address that with her?
25          A       Yes.

1        Q     Did it ever come to your attention prior to

2   March 27, 2017, that the plaintiff never achieved her DANB

3   certification?

4        A     Yes.  I learned that.

5        Q     And as a result of that, did you suspend --

6        A     Yes.

7        Q     -- Ms. Champagne?

8        A     Yes.

9        Q     Would that have been about April 10, 2017?

10       A     Something like that, yes.

11       Q     Did Ms. Champagne ever indicate to you that

12  she was resigning from the company?

13       A     No.

14       Q     You mentioned -- Counsel examined you somewhat

15  extensively about Plaintiff's Exhibit 1.  That's this one

16  right over here.  I'm just going to show you that.  That's

17  my copy.  He's already collected back the originals, but

18  if you could please take a look at -- I don't remember

19  what line it is, but in that exhibit, that's a letter, an

20  email correspondence, that Tarah Jameson wrote.  Is that

21  correct?

22       A     Yeah.

23       Q     That's the one that's addressed to --

24       A     -- Cintia, Ray.

25       Q     Yes.  In that letter, Ms. Jameson uses the

1                     STATE OF CONNECTICUT

2

3        I, KIRSTEN TELHIARD, LSR, a Notary Public, duly

4 commissioned and qualified in and for the State of

5 Connecticut, do hereby certify that pursuant to Notice

6 there came before me on the 27th day of June, 2019, the

7 following named person, to wit: JOLA OCHRIM, who was by

8 me duly sworn to testify to the truth and nothing but the

9 truth; that he was thereupon carefully examined upon his

10 oath and his examination reduced to writing under my

11 supervision; that his deposition is a true record of the

12 testimony given by the witness.

13        I further certify that I am neither attorney nor

14 counsel for, nor related to, nor employed by any of the

15 parties to the action in which this deposition is taken,

16 and further, that I am not a relative or employee of any

17 attorney or counsel employed by the parties hereto, or

18 financially interested in this action.

19                     IN WITNESS THEREOF, I have hereunto set my
hand this 17th day of July, 2019.

20

                              /s/ KT
21                         Kirsten Telhiard, LSR
                        Notary Public

22

23 My Commission Expires:
                 November 30, 2022.

24

25