UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JENNIFER CHAMPAGNE, | : | |
| Plaintiff | : | Case No. 3:18-cv-01390 (VLB) |
| | : | |
| v. | : | |
| | : | |
| COLUMBIA DENTAL, P.C., | : | |
| Defendant | : | December 20, 2021 |

MEMORANDUM OF LAW
IN SUPPORT OF
MOTION FOR JUDGMENT
AS A MATTER OF LAW
<u>AND FOR NEW TRIAL</u>

The defendant in the above-entitled action hereby submits the following memorandum of law in support of its motion, of even date, for judgment as a matter of law and for new trial under Fed. R. Civ. P. 50(b), 59(a)(1)(A) and 59(e).

## I.  <u>BRIEF PROCEDURAL CHRONOLOGY</u>

On November 30, 2021, after the parties had completed their cases-in-chief, the defendant asserted its oral motion for judgment as a matter of law under Fed. R. Civ. P. 50(a).  The defendant based the motion on the ground of insufficiency of the evidence supporting the constructive discharge and hostile work environment theories.  The Court denied the motion from the bench, and then charged the jury.

On December 2, 2021 the jury returned its verdict of $10,000.00 in compensatory damages and $100,000.00 in punitive damages.

The defendant asserts the following motions by its separate pleading of even date:

1.  Motion for judgment as a matter of law under Rule 50(b);

2.  Motion for judgment as a matter of law under Rule 50(b) in order to prevent manifest injustice;

3.  Motion for new trial under Rule 59(a)(1)(A); and/or

4.  Motion for reduction in punitive damages under Rule 59(e) and 42 U.S.C. section 1981a(b)(1).

## II.  DISCUSSION

### A.  There is insufficient evidence to render the defendant liable for maintaining a hostile work environment.

The defendant renews herein its Rule 50(a) motion for judgment as a matter of law by reiterating under Rule 50(b) its claim that it cannot be held liable for maintaining a hostlle work environment.  The defendant, during oral argument on its Rule 50(a) motion, recited the insufficiency of evidence on which the factfinder could find that a hostile work environment existed.  The defendant reiterates that the plaintiff admitted insufficient evidence establishing that the defendant knew or reasonably should have known of any alleged gender harassment.  As an initial observation, the matters raised in the Rule 50(b)

motion need not be identical to those raised in the Rule 50(a) motion as long as the matters bear some connection to each other.  In *TVT Records v. The Island Def Jam Music Group,* 412 F.3d 82 (2d Cir. 2005), the defendant, in arguing under Rule 50(b) that insufficient evidence was adduced to support tortious interference and fraudulent concealment theories, argued during the Rule 50(a) hearing: "The fraud claim is nothing more than an effort to get around the fact that there was no breach of contract.  It's dressing up a breach of contract claim in an aggravated description of what went on here.  They are trying to circumvent the law of contract and impose fraud liability when there is no contract."  The Second Circuit rejected, at page 90, n. 6, the plaintiff's waiver claim, observing that the foregoing argument was sufficient to preserve the claims of insufficient evidence on the tortious interference and fraudulent concealment theories for Rule 50(b) consideration.  Similarly, the present defendant's discussion of hostile work environment elements in connection with the Rule 50(a) motion hearing is sufficient to preserve for Rule 50(b) consideration the defendant's claims of the absence of actual and constructive notice.

*Wiercinski v. Mangia 57, Inc.,* 787 F.3d 106 (2d Cir. 2013), involved a claim for religion and national origin discrimination, retaliation, conspiracy and wrongful termination.  The jury, using a special verdict form, found that the defendant maintained

through a supervisor a hostile work environment.  It awarded $1.00 nominal damages and $900,000.00 punitive damages.  The trial court, upon the defendant's motion under Rules 50 and 59, vacated the liability verdict, condtionally granted a new trial on the punitive damages award, and denied the plaintiff's application for counsel fees.  The trial court was patently perturbed by the plaintiff's "glaring inconsistencies" between his trial and deposition testimony, which discomfiture underlay its postverdict rulings.

The Second Circuit affirmed the vacating of the punitive damages award, reinstated the liability verdict, and remanded for reconsideration of the counsel fees order, intimating that that case might constitute one of those instances in which a plaintiff who "formally prevails under §1988 should receive no attorney's fees at all."  *Id.* at 116.  The appellate tribunal, perhaps sympathetic to the trial court's condemnation of the plaintiff's credibility, observed that, in considering a Rule 50(b) motion, assessment of the weight of conflicting evidence and the evaluation of credibility are without the province of the court in a jury trial.

The court noted that employer liability depends on whether the harassment is perpetrated by a supervisor or a non-supervisory co-worker.  If perpetrated by a non-supervisory co-worker, the plaintiff must show that the employer knew or reasonably should have known about the harassment but failed to take appropriate remedial action.

*Id.* at 113.  The employer is strictly liable if a supervisor perpetrates the harassment, unless the employer shows that it exercised reasonable care to prevent and correct any harassing behavior, and that the plaintiff unreasonably failed to avail herself of any preventive or corrective opportunities provided by the employer.  *Id.*  A "supervisor" is an employee authorized to take tangible employment actions, that is, to make economic decisions concerning other employees' job statuses.  *Id.* at 114.

In applying to the evidence admitted in the present proceeding the principles expressed in *Wiercinski,* we observe that the defendant had maintained during the period of the alleged subject events in 2016 and 2017 a written sexual harassment policy, admitted as defendant's exhibit C, which policy was contained within the defendant's employee handbook.  The plaintiff ackowledged on November 18, 2021 during cross examination that she received and reviewed said employee handbook, including said written sexual harassment policy.  This exhibit consists of three and one-half pages of text disclosing the company's policy concerning sexual harassment in the workplace perpetrated by fellow employees and supervisors.  This policy, as contained in exhibit C, confirms the defendant's abjuration of all forms of sexual harassment.  Moreover, this policy provides explicit instructions to any employee who believes that she has been

subjected to sexual harassment.  This policy recites in pertinent part at the bottom of the

third page of exhibit C (denominated as page 9 of the employee handbook):

> …Due to the very serious nature of harassment, discrimination and
> retaliation, you must report your concerns to one of the individuals
> listed below:
>
> 1.  Discuss any concerns with Jeffery Smith, General Manager at
> (203) 494-7292 and 483 Middle Tpk., Manchester, CT 06040.
>
> 2.  If you are not satisfied after you speak with Jeffery Smith, or
> if you feel that you cannot speak to Jeffery Smith, discuss your
> concerns with Graciela Panuncio, Regional Manager at (860)
> 913-3316 and 483 Middle Tpk., Manchester, CT 06040.

This company written policy governing the management of gender harassment

clearly and unequivocally designates two persons the defendant authorized to receive

and act upon employee complaints of gender harassment: Jeffery Smith as the principal

agent, and Graciela Panuncio as the secondary agent.  The jury had with them this

written sexual harassment policy, and presumably reviewed it during its deliberations.

On November 18, 2021 between 10:32 a.m. and 11:00 a.m. the plaintiff recounted

during direct examination her attempts to notify the defendant of her concerns with Dr.

Stanko.  The plaintiff said she provided a written statement to four of the defendant's

employees, namely Tarah (Jameson), Ray (Belisle), "Cynthia" (Cintia Legault), and "Yola"

(Jolanta Ochrim).  The Court excluded, as hearsay, evidence of the contents of such

purported written statement, since the plaintiff had laid no foundation that any of these four individuals were authorized by the company to receive and act on complaints of gender harassment.  The plaintiff herself acknowledged that she believed Belisle was involved in PR (presumably public relations).  The plaintiff also stated that she believed that Ochrim served as a district manager, but the court excluded, on the bases of hearsay and lack of foundation, evidence of precisely what occupational duties are subsumed within the title of regional manager.

Jameson, during her direct examination on November 19, 2021, disclaimed possessing any human resources duties.  Jameson confirmed that she was a lead dental assistant, whose primary duties included scheduling other dental assistants and acting as a float, substituting for other dental assistants who were absent.  Jameson confirmed during direct examination that she had not been designated as a receiver or manager of gender harassment complaints; she further confirmed that any employee can effect complaints directly to the company.

Legault, during her direct examination on November 19, 2021, disclaimed any gender harassment intervention duties.  Legault also denied at 1:59 p.m. that day having received any written or oral complaints from the plaintiff, concerning Dr. Stanko, after

September 1, 2016.  This evidence directly contradicted the plaintiff's assertion on November 18, 2021 that the plaintiff has sent a "written statement" to Legault.

Jolanta Ochrim testifed on November 19, 2021 that her job duties consisted primarily concerning matters of safety, financial, insurance and patient followup treatment.  Ochrim did not confirm that she was in any manner involved with gender harassment complaint management.  Further, Ochrim denied that the plaintiff ever submitted to Ochrim any "written statement" concerning Dr. Stanko.  This testimony also contradicts the plaintiff's assertions.

Thus, the plaintiff admitted no evidence that any of Belisle, Jameson, Legault and Ochrim, those persons to whom the plaintiff claims she submitted a "written statement," were authorized to receive and act upon complaints of gender harassment.  But that omission may be moot.  It appears that the more poignant omission is that the plaintiff never admitted any evidence that she complained to Jeffery Smith or Graciela Panuncio, those persons designated expressly in the company written sexual harassment policy as the persons to whom the plaintiff should have asserted her complaints.  The plaintiff thus violated the sexual harassment complaint provisions in the company handbook.  Accordingly, by virtue of this omission and violation, the plaintiff never properly notified

the defendant of her complaints of alleged gender harassment, thus failing to establish the notice element of her hostile work environment theory.

Dr. Stanko confirmed during direct examination on November 19, 2021 that his duties excluded personnel management concerning hiring, demotion and discharge. Since Dr. Stanko was therefore not authorized to effect tangible employment actions, he was not a supervisor in the context of the doctrine of vicarious liability. *Wiercinski v. Mangia 57, Inc.,* 787 F.3d at 114.

If the alleged gender harassment is perpetrated by a non-supervisory co-worker, as was Dr. Stanko, the plaintiff must show that the defendant company knew or reasonably should have known about the harassment but failed to take appropriate action. *Id.* at 113. In the present case, the plaintiff failed to prove that the defendant knew or reasonably should have known about her concerns. None of the four persons she identified as persons to whom she purportedly transmitted a "written statement" – Jameson, Belisle, Legault and Ochrim – were authorized or empowered to receive and act on complaints of gender harassment. Assuming that the plaintiff actually did furnish such notice (the evidence is conflicting), such notice was ineffective to apprise the defendant itself of the plaintiff's concerns. Complaining to a fellow dental assistant or

other non-authorized employee is insufficient to furnish at least the minimum of constructive notice under *Wiercinski.*

      If we assume that Dr. Stanko was a supervisor, then the employer is strictly liable, unless the employer exercised reasonable care to prevent or correct any harassing behavior, and the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities. *Id.* at 113. Here, the defendant, by instituting the aforementioned written sexual harassment policy, containing prescribed complaint channels and investigation mechanisms, exercised reasonable care to correct any such conduct. Further, the plaintiff, by failing to notify Smith or Panuncio, failed thereby to take advantage of the mechanisms inherent in such policy.

      Even more critical is the plaintiff's failure to notify Smith or Panuncio, those persons that the defendant did designate as the company representatives authorized to receive and act on complaints of gender harassment.

      The plaintiff thus failed to admit evidence sufficient to establish employer liability. While the jury is the sole arbiter of the credibility of witnesses and the weight to be accorded to the evidence, the jury cannot find a fact as to which no evidence exists to support it. Here, the jury, by finding impliedly that the defendant possessed either actual or constructive knowledge, as the plaintiff was required to establish, did exactly that. It

found such notice despite the absence of, not simply insufficient, but any, evidence showing such knowledge.

As an alternative claim, if the Court declines to consider the defendant's Rule 50(b) motion for judgment as a matter of law on waiver grounds, it should entertain it on the basis of manifest injustice.  A party may assert a Rule 50(b) motion without raising previously a Rule 50(a) motion at all, in an effort to prevent manifest injustice.  *ING Global v. United Parcel Service Oasis Supply Corporation,* 757 F.3d 92, 97 (2d Cir. 2014). Such manifest injustice exists when the verdict "is wholly without legal support."  *Id.* The verdict in the present proceeding, for all of the aforestated reasons, lacks legal support because no evidence supports actual or constructive knowledge on the part of the defendant, or that the plaintiff availed herself of the opportunities set forth in the written sexual harassment policy.

**B.  There is insufficient evidence to render the defendant liable for punitive damages.**

The statutory foundation of the analysis regarding punitive damages begins with a review of the statute that established the right to seek punitive damages.  42 U.S.C. section 1981a(a)(1) permits a plaintiff in an action brought under 42 U.S.C. section 2000e-5 for "unlawful intentional discrimination…prohibited under [42 U.S.C. sections 2000e-2,

2000e-3 and 2000e-16] [to] recover compensatory and punitive damages as allowed in subsection (b)…"

42 U.S.C. section 1981a(b)(1) permits the recovery of punitive damages if the plaintiff "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

The judicial foundation of the section 1981a analysis begins with *Kolstad v. American Dental Association,* 527 U.S. 526 (1999).  There, an en banc panel of the D.C. Circuit Court of Appeals, modifying the decision of the original three judge panel, affirmed the District Court's denial of the plaintiff's request to charge the jury on punitive damages, believing that the plaintiff must show that the defendant committed egregious acts to support an award of punitive damages.

The U.S. Supreme Court in *Kolstad* defined first the phrase "intentional discrimination," employed in section 1981a(a)(1), to mean those cases that are not founded on a disparate impact theory, impliedly construing the statute to apply only to cases proceeding under a disparate treatment theory.  *Id.* at 534.

The Court explained further that section 1981a(b)(1) limits punitive damages awards to acts perpetrated "with malice or reckless indifference."  *Id.*  Thus, the trial

court must apply a two-tier evaluation: the court must assess whether the plaintiff has shown, first, intentional discrimination; and, second, the additional malice/reckless indifference threshold.  *Id.*

In addressing the D.C. Circuit en banc panel's emphasis on egregious conduct, *Kolstad* explained that the descriptive words "malice" and "reckless" focus on the actor's (essentially the employer's) state of mind.  Egregious conduct may constitute evidence of the requisite mental state, but it is not an independent element.  Malicious and reckless acts cases are conceptually a subset of intentional discrimination cases. *Id.* at 535.

More specifically, "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not simply its awareness that it is engaging or has engaged in discrimination.  *Id.*  This is a sensible construction, as section 1981a(b)(1) applies the elevated requirements of malice or reckless indifference "to the federally protected rights of" employees.  Stated differently, an employer's mere suspicion or even outright awareness of discrimination is insufficient to justify an award of punitive damages; the employer must be cognizant that such discriminatory conduct violates Title VII.  Further, the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."

*Id.* at 536.  A positive element of conscious wrongdoing is always required.  *Id.* at 538.  Further, where there exists no evidence giving rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the court should not submit to the jury the issue of punitive damages.  *Id.* at 538-9.

*Kolstad* further instructs us that the punitive damages inquiry does not end with the demonstration of the requisite malice or reckless indifference.  The plaintiff must impute to the defendant employer punitive damages liability.  *Id.* at 544.  In some instances the existence of a written sexual harassment policy instituted in good faith operates as a total bar to employer liability for punitive damages.  *Id.*  Further, and most pertinent to the instant proceeding, the institution of a written sexual harassment policy goes a long way toward refuting a claim of a malicious or reckless state of mind.  *Id.*  The Court thus concluded, at page 545, that an employer may not be vicariously liable for discriminatory employment decisions, which presumably includes discriminatory acts, of managerial agents, where such decisions or acts are contrary to the employer's good faith efforts to comply with Title VII, which efforts are manifested in the institution and implementation of a written sexual harassment policy.

*Wiercinski* stated that punitive damages are "a discretionary moral judgment" that a defendant engaged in conduct so reprehensible that it warrants punishment.

*Wiercinski v. Mangia 57, Inc.,* 787 F.3d. at 115.  Punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id.*  A plaintiff may prove the requisite state of mind with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive.  *Id.*  Thus, *Wiercinski,* consistent with *Kolstad,* emphasized the necessity of evidence illuminating the employer's state of mind, and more particularly, a state of mind addled with evil motive or awareness of contravention of Title VII.

The Second Circuit observed in *Wiercinski* that a defendant may seek a vacatur where the record lacks evidence that the defendant's conduct was driven by an evil motive or intent or involved reckless or callous indifference to the employee's rights.  *Id.* Further, the Court explicitly stated that an employer's failure to act after receiving complaints of harassment is insufficient by itself to warrant an award of punitive damages, even if such knowledge of harassment could demonstrate such employer's liability for co-worker harassment.  *Id.*  Stated somewhat differently, mere establishment of an employer's actual or constructive knowledge of co-worker harassment, coupled

with such employer's failure to take appropriate remedial action, only permits, assuming the plaintiff has established all elements of her gender harassment cause of action, the assessment of ordinary liability for compensatory damages; it is insufficient to justify an award of punitive damages.  Citing *Kolstad, Wiercinski* reiterated, at page 116, the high threshold for punitive damages under section 1981a.  The Second Circuit, in *Wiercinski,* affirmed the District Court's vacating of the jury's punitive damages award, even though the defendant did not specifically request such relief.  The Court notably commented, at page 116, "[n]o reasonable jury could conclude that Mangia's conduct was 'driven by an evil motive or intent, or that it involved a reckless or callous indifference to [Wiercinski's] federally protected rights." (Citation omitted; internal quotation marks omitted.)  "Given the high standard for punitive damages set forth in Section 1981a and by the Supreme Court in *Kolstad*, we affirm the district court's ruling to the extent it vacated the award of punitive damages."  *Id.*

The evidence adduced at the trial fails to demonstrate that the plaintiff has met the evidentiary requirements of section 1981a(b)(1).  It is difficult to identify specific pages and lines of the trial transcript, or specific days and minutes of trial testimony contained on the compact disks, because we are not attempting to highlight the presence of particular evidence, but the absence thereof.  Specifically, the plaintiff has failed to show

16

that the defendant company engaged in "discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Wiercinski v. Mangia 57, Inc.,* 787 F.3d at 115. *Wiercinski* instructs us that punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* Such evidence depends further on evidence of the defendant's state of mind, specifically, that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or evidence of egregious or outrageous acts that may serve as evidence supporting an inference of requisite evil motive. *Id.* Simple failure to act after receiving complaints about harassment does not by itself express such evil intent or motive, warranting an award of punitive damages, even if such evidence could establish employer liability for co-worker harassment. *Id.*

In the present case the plaintiff said she complained to Jameson, Belisle, Legault and Ochrim. Aside from the fact that (1) none of these four individuals were shown to be authorized to receive and act upon complaints of gender harassment; and (2) Legault and Ochrim denied having received any such complaints directly from the plaintiff; there is absolutely no evidence showing, or even suggesting, that any of these four individuals perceived a risk that their failure to act would violate Title VII. Furthermore, there is no

evidence that the conduct of any of these four individuals was "motivated by evil motive or intent," or involved "reckless or callous indifference" to rights under Title VII. *Miercinski v. Mangia 57, Inc.,* 787 F.3d at 115.  The most that may be inferred from the evidence, an inference the defendant nevertheless posits is devoid of reason, is that one or more of these four individuals was perhaps aware of discrimination and simply failed to act upon it, which, if accurate, still falls well short of establishing an evidentiary foundation for the award of punitive damages.  It is difficult for the defendant to act upon complaints of gender harassment if the employee, as discussed supra, fails to lodge her complaints properly with the defendant's managers designated for that purpose.  If the defendant was unaware of the existence of such complaints, it becomes even more difficult to comprehend how the defendant could have harbored malice or reckless indifference.

If the Court declines to proceed under Rule 50(b) to vacate the entire award of punitive damages, it should reduce significantly the amount thereof by offering a remittitur.

**C.  As an alternative remedy to vacating the compensatory and punitive damages awards under Fed. R. Civ. P. 50(b), the Court, if it declines to enter such relief under Rule 50(b), should grant a new trial under Rule 59.**

Fed. R. Civ. P. 59(a)(1)(A) permits the Court to grant a new trial, after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court…"

A court may order a new trial under Rule 59(a) on the ground that the verdict is against the weight of the evidence. *ING Global v. United Parcel Service Oasis Supply Corporation,* 757 F.3d 92, 99 (2d Cir. 2014). A court may adjudicate a motion for a new trial under Rule 59(a) even in the absence of a Rule 50(a) motion or Rule 51 objection to proposed jury instructions. *Id.* at 99. A jury decision is against the weight of the evidence if it is (1) seriously erroneous, or (2) a miscarriage of injustice. *Id.* Under Rule 59, unlike under Rule 50, the court itself may weigh the evidence and credibility of witnesses, and need not view the evidence in the light most favorable to the nonmovant. *Id.* Where the verdict is predicated almost entirely on the jury's assessments of credibility, the verdict generally should remain intact except in egregious cases, to correct a seriously erroneous result, or to prevent a miscarriage of justice. *Id.* Jury assessments of credibility are particularly deserving of deference in cases in which the result hinges significantly on the credibility of a single witness. *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 418 (2d Cir. 2012).

In the present case, no single witness was instrumental.  The plaintiff called two witnesses, and the defendant called four, the credibility of all of which witnesses presumably was, as in most trials, significant, but no more so in this action than most others.

The Court here should weigh the evidence and the credibility of the plaintiff.  The defendant cites as illustrative the case of *Bentley v. Autozone, LLC,* 935 F.3d 76 (2d Cir. 2019), wherein the Second Circuit affirmed the District Court's entry of summary judgment for the defendant.  In that case the plaintiff had sought to inject a genuine issue of material fact in opposition to the defendant's motion for summary judgment through her deposition testimony, which she contended refuted some of the defendant's claims. The court held, at page 86, that where the plaintiff's deposition testimony is the only evidence supporting her claim of notice to the employer, if such deposition testimony is "compromised and contradicted" it may be insufficient to raise a genuine issue of fact as to notice.

Focusing currently on the issue of punitive damages, particularly regarding the malice and reckless indifference requirements, there exist two principal reasons supporting this Court's vacating or reduction of the punitive damages award.  First, the plaintiff's evidence of sexual harassment and employer notice is so rife with hyperbole

20

and blatant inconsistencies that it is difficult to infer that the defendant harbored malice or reckless indifference.  Stated somewhat differently, if the plaintiff herself presented a confusing and inconsistent story of her experience, then it is likely that the employer would have been confused or misled about such experience, thus undermining any claim of malice, evil motive, or reckless indifference.  Evidentiary examples abound.

First, defendant's exhibit N consisted of the plaintiff's May 22, 2019 responses to the defendant's interrogatories.  Defendant's exhibit P-2 consisted of portions of the plaintiff's June 17, 2019 deposition transcript.  Probably the most important of the plaintiff's allegations is her accusation that Dr. Stanko massaged the plaintiff's shoulders, as it is the only complaint that involves physical contact.  Page 3 of exhibit N recited the interrogatory "State the precise dates on which, and exact locations at which, Dr. Stanko allegedly 'massaged' your shoulders."  The plaintiff responded thus: "Dr. Stanko 'massaged' the Plaintiff's shoulders in the Rocky Hill office after the Plaintiff complained about neck pain in front of Dr. Stanko in March 2017."

In exhibit P-2, the plaintiff's deposition, on page 103, lines 6-8 the following exchange occurred: "Q. When was the first time [regarding the alleged massages]?  A. Around November I hurt my neck.  I want to say it was November.  Q. 2016?  A. Uh-huh." On page 105, lines 3-7 the following exchange occurred: "Q. When was the second time?

21

A. It was right around the same time because my neck was bothering me for like two weeks.  I want to say within two weeks of that."  Finally, on page 108, lines 4-5 the question was "You don't recall any other incidents?"  The plaintiff's response, on lines 6-7, was "No.  Just those two I remembered around the time."  Thus, on May 22, 2019 the plaintiff swore that Dr. Stanko massaged her shoulders just once, in March, 2017.  Barely a month later, she swore that Dr. Stanko massaged her shoulders twice, both incidents occurring in November, 2016, about two weeks apart.  To further confuse the situation, the plaintiff testified during direct examination on November 16, 2021 that Dr. Stanko placed his hands on her shoulders "several times," three or four times, the first occurring in October or November, 2016, the second in "December, 2016," and the third in the beginning of March, 2017.  We thus have three different testimonial episodes and three entirely different versions of the same story, all from the same witness.

The plaintiff also rendered inconsistent accounts of her statements to Dr. Stanko just prior to the occurrence of these alleged incidents of physical contact.  In exhibit P-2, pages 103 to 104 the question was whether the plaintiff said anything to Dr. Stanko prior to the first alleged massage, to which the plaintiff replied "I told him my neck was really bothering me today.  It was very sore today."  Regarding the second alleged incident, on page 106, lines 1-3 the question was "You complained first about your neck pain?"  The

plaintiff's response was "Yes."  But on November 16, 2021 the plaintiff testified that she said nothing to Dr. Stanko prior to each such alleged incident.

Most strange was the plaintiff's failure to notify the defendant in writing of these alleged massages.  In exhibit P-2, lines15-23 the questions focused on whether the plaintiff ever submitted to the company any written complaints concerning such incidents.  The plaintiff responded on lines 18 and 23, respectively, "Not that I recall" and "I don't remember."  Such silence is inconsistent with her trial testimony that she delivered a "written statement" to Belisle, Jameson, Legault and Ochrim about everything else, but neglected to include therein any reference to these alleged massages.

There are, of course, other examples of inconsistencies and hyperbole.  The point here is that if the plaintiff herself did not know exactly when Dr. Stanko allegedly touched her shoulders, and did not submit any written complaints to the defendant about such incidents, then it is difficult to discern how the defendant could have been aware of such complaints, and, moreover, how the defendant could have harbored an evil motive, malice, or reckless indifference to the plaintiff's federally protected rights in connection therewith.

The second principal reason is grounded in legal precedent. *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996) established the three indicia courts should utilize in evaluating the constitutional propriety of punitive damages awards: (1) reprehensibility of the defendant's conduct; (2) ratio of punitive damages award to the actual harm inflicted; and (3) state sanctions imposed for comparable conduct. *Id.* at 568. Although *Gore* involved a state court assessment of punitive damages occasioned as a result of violation of a state statute, the *Gore* guideposts are applicable to federal district court punitive damages awards rendered in connection with federal questions. *Stampf v. The Long Island Railroad Company,* 761 F.3d. 192, 209 (2d Cir. 2014).

*State Farm Mutual Automobile Insurance Company v. Campbell,* 538 U.S. 408 (2003) extended the modern analytical framework concerning punitive damages awards. The Supreme Court there indicated that perhaps the most salient of the *Gore* factors is the reprehensibility indicium. Five factors, in turn, assist in the application of the reprehensibility indicium: (1) whether the harm was physical as opposed to economic, with the former classification weighing more heavily; (2) whether the tortious conduct evinced indifference to or reckless disregard of the health or safety of others; (3) whether the target exhibited some financial vulnerability; (4) whether the challenged conduct was repeated or isolated; and (5) whether the harm was the result of intentional malice,

24

trickery or deceit.  *Id.* at 419.  The absence of any one or more of these indicia may suggest the non-applicability of reprehensibility.  *Id.*

In applying to the evidence in the instant proceeding the foregoing *Campbell* reprehensibility indicia, the alleged harm was neither physical nor economic.  The only acts the plaintiff alleged having a physical base were the contacts with the shoulders, and perhaps the tossing of burrs, if deemed credible.  The plaintiff, regardless of the transpiration of any of these acts, did not offer any evidence of physical harm or injury as a result of any such alleged acts.

Regarding the second indicium, the alleged shoulder massages do not evince a reckless disregard of the health or safety of the plaintiff or any others.  The only possible act of which the plaintiff complained that might be linked to health or safety might be the tossing of the burrs, if a reasonable factfinder could believe that a health care provider would perform such an act, which act Dr. Stanko vehemently denied.

The third indicium, regarding the target's financial vulnerability, is irrelevant here. The alleged acts had no effective impact on the plaintiff's financial status.  She retained her position, despite her absence of qualifications, until the defendant realized that the plaintiff probably was not going to obtain her DANB certification at any time.

Regarding the fourth indicium, it is difficult, as a result of the plaintiff's evidentiary shortcomings, to assess when and how often the acts she alleged were hostile occurred, if same even occurred at all.  For example, as discussed supra, inconsistency permeates the evidence regarding the shoulder contacts, such that it is difficult to discern whether same occurred once in March, 2017, twice in November, 2016, sometime between those temporal parameters, or, more probably, never at all.  Likewise, the alleged burr-throwing incidents suffer from the same inconsistencies.  The plaintiff testified during cross examination on November 18, 2021 that Dr. Stanko threw burrs at her on eight occasions, then later acknowledged that such acts actually occurred fewer than eight times.  Based on such mendacity, it is quite likely that such incidents, if they occurred at all, may have occurred very sporadically.

There exists no evidence that the defendant company's conduct was the result of intentional malice, trickery or deceit.  If anything, as discussed supra, it was the result, at most, of mere negligence based on the defendant's knowledge and failure to act; although, again, the defendant disputes such notice and any alleged failure to act.

Upon application of the aforementioned five indicia, the defendant's behavior is imbued with a low degree of reprehensibility.

Analyzing the second *Gore* factor – the ratio of punitive damages to the harm inflicted – militates against the affirmance of the punitive damages award.  First, the court must presume that the plaintiff was made whole by the compensatory damages award.  *State Farm Mutual Automobile Insurance Company v. Campbell,* 538 U.S. at 419.  The jury here awarded the plaintiff compensatory damages of $10,000.00 for essentially non-physical harm.  The jury added punitive damages of $100,000.00.  Such a verdict constitutes a 10 to 1 ratio of punitive damages to compensatory damages.  In practice, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.  Further, "we concluded that an award of more than four times the amount of compensatory damages might  be close to the line of constitutional impropriety…[t]he Court referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish…[w]hile those ratios are not binding, they are instructive." *Id.*  Few awards exceeding single digit ratios between the size of the punitive and compensatory damages awards will satisfy due process.  *Stampf v. The Long Island Railroad Company,* 192 F.3d at 210.

In *Fernandez v. North Shore Orthopedic Surgery & Sports Medicine, P.C.*, 79 F. Supp. 2d 197, 207 (E.D. N.Y. 2000), the District Court reduced under Rule 59 a punitive

damages award from $100,000.00 to $50,000.00 where no evidence existed of violence or threats of violence, or repeated instances of employer misconduct. *Fernandez* also collected numerous other District Court decisions adjudicating motions for new trials grounded on excessive punitive damages awards, including: *DeCurtis v. Upward Bound International, Inc.*, docket number 09-cv-5378 (S.D. N.Y. 2011) (court set punitive damages at $75,000.00 where a supervisor repeatedly touched the plaintiff in a sensual manner, sent the plaintiff sexually explicit emails, made sexually explicit comments, and threatened to discharge the plaintiff when she complained); *Chisholm v. Memorial Sloan Kettering Cancer Center,* 824 F. Supp. 2d 573 (S.D. N.Y. 2011) (the court reduced a punitive damages award from $1 million to $50,000.00 where there existed no evidence of violence, threats, slurs or offensive language, noting that the $50,000.00 figure is more consistent with similar circuit cases); *Norris v. New York City College of Technology,* docket number 07-cv-853 (E.D. N.Y. 2009) (the court reduced a punitive damages award from $425,000.00 to $25,000.00 where there existed no evidence of threats or violence or repeated acts); *Lamberson v. Six W. Retail Acquisitions,* docket number 98-cv-8053 (S.D. N.Y. 2002) (the court reduced a punitive damages award from $375,000.00 to $30,000.00 where there existed no evidence of violence, threats, deceit, malice, or history of misconduct); and *Kim v. Dial Services International,* docket number 96-cv-3327 (S.D. N.Y.

1997) (the court reduced a punitive damages award from $725,000.00 to $25,000.00 where there existed no evidence of violence and "very little repetition of the misconduct"). These precedents also  implicate the third *Gore* factor, that authorizing a comparison to sanctions levied in similar actions.

The 10 to 1 ratio in the present controversy far exceeds the suggested four to one ratio observed in *Campbell.*  Further, the evidence here appears more consistent with the evidence discussed in the aforementioned precedents, in most of which the courts reduced substantial punitive damages awards to amounts in the $25,000.00 to $50,000.00 range.  Like those precedents, in the present case there was no evidence of physical injury or threats of physical injury, no offensive slurs, and no malice or deceit.

The appropriate procedural vehicle to accomplish such a reduction of an excessive punitive damages award is through a remittitur.  "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  *Stampf v. The Long Island Railroad Company*, 761 F.3d at 204.

The court may enter a conditional order of remittitur, compelling the plaintiff to elect between a reduction of the excessive verdict and a new trial in at least two types of cases: (1) where the court can identify an error that caused the jury to include a quantifiable amount in its verdict, which amount should be stricken, and (2) where the

award is intrinsically excessive such that it is greater than the amount a reasonable jury could have awarded without being ascribable to a particular quantifiable error.  *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 165 (2d Cir. 1998).  Regarding the second category, the test for an excessive verdict is one which shocks the judicial conscience and constitutes a denial of due process.  *Id.*  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the imposition of grossly excessive or arbitrary punishments on defendants.  *State Farm Mutual Automobile Insurance Company v. Campbell,* 538 U.S. 408, 416 (2003).

The jury, by impermissibly finding notice, appears to have ignored exhibit C.  The jury further appears to have behaved arbitrarily in levying a punitive damages award grossly disproportionate to its compensatory damages award, especially considering the paucity or absence of evidence of evil  motive, malice or reckless indifference.

Even if the Court here determines that the verdict was predicated almost entirelyon the comparative credibility of the plaintiff and the defense witnesses, and thereby refuses to weigh independently the evidence and evaluate the plaintiff's credibility, the Court should consider the instant proceeding an example of an egregious case, one yielding a seriously erroneous result, and/or one generating a miscarriage of justice.  *ING Global v. United Parcel Service Oasis Supply Corporation,* 757 F.3d 92, 99 (2d Cir. 2014).  Here, the

Court should evaluate the evidence, including what the defendant perceives as the poor credibility of the plaintiff, whose deposition testimony and interrogatory responses were often starkly inconsistent, not just with each other, but with her trial testimony as well. An evaluation of all of the evidence probably would disclose the absence of anything remotely suggesting that the defendant acted with an evil motive, malice, or reckless indifference.  The defendant has scoured through the evidence and cannot locate any testimony or exhibit that evinces such malicious intent on the part of the defendant, cognizant that the two persons nominated in the employee handbook were unaware of the plaintiff's remonstrations.  Permitting such a seriously erroneous award of punitive damages to remain intact on the absence, or at least the extreme paucity, of evidence of the defendant's state of mind, particularly malice or reckless indifference, would constitute a miscarriage of justice.  The award of punitive damages therefore should be vacated, remitted, or at least subject this action to a new trial.

III.  CONCLUSION

In light of the foregoing applicable legal principles and relevant evidence, the defendant moves under Fed. R. Civ. P. 50(b), 59(a)(1)(A) and 59(e) for the following remedies in the following order:

1.  That the Court vacate, under Rule 50(b), in toto the compensatory and/or punitive damages awards because of insufficient evidence supporting either award;

2.  That the Court vacate, under the manifest injustice doctrine, in toto the compensatory and/or punitive damages awards because of insufficient evidence supporting either award;

3.  That the Court reduce, under Rule 50(b) and/or Rule 59(e), the punitive damages award because of insufficient evidence demonstrating malice or reckless indifference;

4.  That the Court order, under Rule 59(a)(1)(A), a new trial on all issues because of insufficient evidence supporting an award of punitive damages, or offer a remittitur to an appropriate amount.

**Defendant**

**By   /s/ Thomas A. Amato**
**Thomas A. Amato**
**357 East Center Street**
**Manchester, CT 06040**
**Telephone: 860-643-0318**
**Facsimile: 860-643-2725**
**Email: AmatoLaw@att.net**
**Federal bar number ct14221**
**Its Attorney**

This is to certify that a copy of the foregoing was filed electronically and served via regular mail on any party unable to accept service via electronic filing.  Notice of this filing will be sent by electronic mail to all parties by virtue of the Court electronic filing system or via regular mail to any party unable to accept electronic filing as set forth in the Notice of Electronic Filing, accessible through the Court's CM/ECF system; on December 20, 2021.

_____/s/ Thomas A. Amato_____
**Thomas A. Amato**